2020 PA Super 165

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JEROME L. RANKIN | : | |
| | : | |
| Appellant | : | No. 856 WDA 2018 |

Appeal from the Judgment of Sentence Entered April 30, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0010860-2017

BEFORE: BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

OPINION BY BENDER, P.J.E.: FILED JULY 10, 2020

Appellant, Jerome L. Rankin, appeals from the judgment of sentence of a $200 fine, imposed after the trial court found him guilty of three summary violations of the Motor Vehicle Code ("MVC"), 75 Pa.C.S. §§ 1501-1586. The trial court issued the guilty verdict after the jury, early in the same consolidated jury/bench trial, had acquitted Appellant of a misdemeanor MVC charge that also arose from the incident underlying the summary MVC violations. Appellant asserts that collateral estoppel and double jeopardy principles precluded the non-jury guilty verdict, arguing that his identity was the only contested issue before the jury and, therefore, that the trial court's verdict had essentially nullified the jury's verdict. After careful review, we reverse Appellant's judgment of sentence.

_____

[*] Retired Senior Judge assigned to the Superior Court.

The trial court summarized the facts adduced at Appellant's trial and procedural history of this case, as follows:

> On or about June 5, 2017, Appellant was charged at [CP-02-CR-0010860-2017] with one count of Fleeing or Attempting to Elude Police, in violation of 75 Pa.C.S. § 3733, which was graded as a misdemeanor of the second degree. Also stemming from the same incident, Appellant was charged with one count each of Reckless Driving, in violation of 75 Pa.C.S. § 3736(a); Driving at an Unsafe Speed, in violation of 75 Pa.C.S. § 3361; and, [I]gnoring Traffic Control Devices, in violation of 75 Pa.C.S. § 3112(a)(3)(i). [A]ll three of the traffic violations were graded as summary offenses. After a preliminary hearing, at which all the charges were held for trial, Appellant elected to proceed before a jury as factfinder on the misdemeanor charge. The trial court sat as factfinder on the summary offenses.
>
> At trial, University of Pittsburgh Police Officer Jeffrey Crum testified that at about midday, he was monitoring a busy intersection on the Pitt campus when he saw Appellant drive his vehicle through a standing red light. He said that, after Appellant looked around and turned his head toward the officer, the two made eye contact and Appellant accelerated down a main street that runs through the center of campus. The officer explained that, initially, he gave chase. Officer Crum described the heavy pedestrian and vehicle congestion in the area[,] which he said raised safety concerns. He said because of department policy he felt forced to terminate his pursuit so as not to further endanger the lunchtime crowd. Nevertheless, Officer Crum said he got a good look at Appellant and was able to record the license plate of the vehicle Appellant was driving, which eventually led to [his] arrest.
>
> Ultimately, the jury acquitted Appellant of the misdemeanor charge; however, the trial court convicted Appellant of all three summary offenses. The court then immediately imposed the mandatory two hundred dollar ($200.00) fine for reckless driving and no further penalty on the remaining summary convictions.

Trial Court Opinion ("TCO"), 5/29/19, at 2-4 (footnotes omitted).

Appellant's consolidated jury/bench trial and sentencing hearing was held on April 30, 2018. He filed a post-sentence motion challenging his conviction based, inter alia, on principles of double jeopardy and collateral estoppel. On June 7, 2018, the trial court denied Appellant's post-sentence motion following a hearing. Appellant filed a timely notice of appeal, and then provided the trial court with a Pa.R.A.P. 1925(b) statement on July 20, 2018, despite not being ordered to do so. The trial court eventually issued its 7-page Rule 1925(a) opinion on May 29, 2019.

Appellant now presents the following question for our review:

In a consolidated jury/bench trial where the jury acquitted [Appellant] of Fleeing or Attempting to Elude Police Officer, concluding that he was not the driver, whether principles of double jeopardy and collateral estoppel barred the trial court from convicting [him] of Reckless Driving, Driving Vehicle at Safe Speed, and Traffic-Control Signals stemming from the same incident?

Appellant's Brief at 4.

"[T]he application of double jeopardy and collateral estoppel principles in the context of joint jury/bench trials" is an issue "of constitutional magnitude, a pure question of law. Accordingly, our standard of review is de novo, and our scope of review is plenary." Commonwealth v. States, 938 A.2d 1016, 1019 (Pa. 2007) (cleaned up).

The proscription against twice placing an individual in jeopardy of life or limb is found in the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment. The double jeopardy protections afforded by our state constitution are coextensive with those

federal in origin; essentially, both prohibit successive prosecutions and multiple punishments for the same offense.

Id. (citation omitted).

> With respect to the criminal law defendant, collateral estoppel is treated as a subpart of double jeopardy protection and is defined as follows: "Collateral estoppel … does not automatically bar subsequent prosecutions[,] but does bar redetermination in a second prosecution of those issues necessarily determined between the parties in a first proceeding which has become a final judgment." Commonwealth v. Smith, … 540 A.2d 246, 251 ([Pa.] 1988) (citation omitted). As simple as this definition appears, the principle's application is not as straightforward as it is in the civil context because it must be viewed through the lens of double jeopardy. Commonwealth v. Brown, … 469 A.2d 1371, 1373 ([Pa.] 1983) (it is "double jeopardy that forbids the state from offending the collateral estoppel rule").

States, 938 A.2d at 1020.

> In criminal cases,

> the difficulty in applying collateral estoppel typically lies in deciding whether or to what extent an acquittal can be interpreted in a manner that affects future proceedings, that is, whether it reflects a definitive finding respecting a material element of the prosecution's subsequent case. We ask whether the fact-finder, in rendering an acquittal in a prior proceeding, could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. If the verdict must have been based on resolution of an issue in a manner favorable to the defendant with respect to a remaining charge, the Commonwealth is precluded from attempting to relitigate that issue in an effort to resolve it in a contrary way. See Commonwealth v. Zimmerman, … 445 A.2d 92, 96 ([Pa.] 1981) (acquittal on simple assault precluded retrial on hung murder charges because simple assault was a constituent element of all grades of homicide in the case); Commonwealth v. Wallace, 602 A.2d 345, 349–50 ([Pa. Super.] 1992) (Commonwealth's concession that the jury's acquittal meant [the] appellant did not possess a gun collaterally estopped Commonwealth from any subsequent prosecution based on [the] appellant's possession of a gun); Commonwealth v. Klinger, 398 A.2d 1036, 1041 ([Pa. Super.] 1979) ([Klinger]'s acquittal on

- 4 -

murder precluded the Commonwealth from bringing a subsequent perjury prosecution based on [his] trial testimony that he did not kill the victim), aff'd. sub nom. Commonwealth v. Hude, 425 A.2d 313 ([Pa.] 1980). Conversely, where an acquittal cannot be definitively interpreted as resolving an issue in favor of the defendant with respect to a remaining charge, the Commonwealth is free to commence with trial as it wishes. See [Commonwealth v.] Buffington, 828 A.2d [1024,] 1033 [(Pa. 2003)] (acquittal of rape and IDSI did not establish that Commonwealth failed to prove an essential element of sexual assault); Smith, 540 A.2d at 253–54 (acquittal of gun possession charge did not collaterally estop Commonwealth from proceeding on charges of murder and possession of an instrument of crime, as acquittal could have been based on any number of reasons); Commonwealth v. Harris, … 582 A.2d 1319, 1323 ([Pa. Super.] 1990) (robbery acquittal did not preclude retrial on hung charge of aggravated assault)….

States, 938 A.2d at 1021–22 (some citations and quotation marks omitted).

In the instant case, Appellant contends that "the record establishes conclusively that the only issue at … trial was whether or not he was driving the vehicle that fled from the police on June 4, 2017." Appellant's Brief at 15. He further argues that, "[i]n light of the pleadings, the charges, the evidence, the parties' theories and defenses, and the jury's verdict of acquittal, there was a factual finding established, or necessarily implied, in [Appellant]'s favor that he was not the driver of the vehicle." Id. at 15-16.

The trial court disagreed, concluding instead that:

Here, the prosecution did not seek to burden Appellant with successive trials or double punishment; nor has it ever sought to relitigate Appellant's acquittal for Fleeing and Eluding Police or even to relitigate a factual finding that Appellant was the driver in the instant criminal episode. Unlike the trial court in States, who made a factual finding … on the record, there were no factual findings or special interrogatories or stipulations explaining the jury's acquittal. Instead, Appellant was tried before a jury on the single count of Fleeing or Eluding Police and the remaining traffic violations were left to be adjudicated by the

trial court siting as factfinder. Appellant invites the appellate court to speculate as to what elements of Fleeing or Eluding Police the jury found lacking in the Commonwealth's case. [He] claims that the jury must have necessarily found that he was not driving. The task for the jury, however, was not so simple. There are four elements to the charge of fleeing or eluding police and we cannot speculate on the reason or reasons why the jury reached its conclusion.

TCO at 7 (emphasis added). The Commonwealth echoes the trial court, reasoning that:

The [t]rial [c]ourt was permitted to convict [A]ppellant in a simultaneous jury/non-jury proceeding, even though the jury acquitted him of a factually related charge, because the jury did not announce any factual findings with their verdict that would have cabined the [t]rial [c]ourt and prevented it from finding that [A]ppellant was the actor in this case. Thus, because there were no factual findings accompanying the jury's verdict in this case, it would be speculation to draw any conclusion about how the jury reached its verdict.

Commonwealth's Brief at 11 (emphasis added).

As emphasized above, the trial court and the Commonwealth essentially assert that the lack of specific factual findings by the jury precludes Appellant's collateral estoppel argument.[1] Indeed, if such a bright-line rule exists, resolution of the matter is mechanically predetermined: The jury's general verdict was not accompanied by any findings of fact, and therefore the trial court concluded, ipso facto, that there was no violation of double jeopardy

_____

[1] The Commonwealth cites this Court's decisions in Commonwealth v. Yachymiak, 505 A.2d 1024 (Pa. Super. 1986), and Commonwealth v. Wharton, 594 A.2d 696 (Pa. Super. 1991), for support. We discuss these cases in detail, infra.

principles when the trial court issued a verdict ostensibly inconsistent with the jury's acquittal.

However, while the presence of specific factual findings is often dispositive of double jeopardy questions in particular cases, see e.g., States,[2] it does not follow that the absence of specific factual findings is always fatal to a double jeopardy claim in all cases when a jury renders a general verdict. Indeed, in the seminal case of Ashe v. Swenson, 397 U.S. 436 (1970), the United States Supreme Court clearly dispelled that view.[3]

As the Ashe Court instructed,

> [t]he federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude

_____

[2] In States, the defendant "and two other men were in an automobile that was in a single vehicle accident.... States survived the crash, but the two other men died." States, 938 A.2d at 1017. The Commonwealth charged States with numerous offenses related to their death. He proceeded to a consolidated jury/non-jury trial, where the jury considered involuntary manslaughter and related charges, while the court considered the charge of accidents involving death while not properly licensed. The jury deadlocked, but the trial court found States not guilty of accidents involving death. In acquitting States, the trial court specifically found that there was reasonable doubt as to whether States was the driver. Our Supreme Court held that double jeopardy and collateral estoppel precluded States' retrial on involuntary manslaughter due to that specific factual finding. Id. at 1027.

[3] The Pennsylvania Supreme Court noted that "Ashe ... demonstrate[s] the primary effect, and underlying purposes, of both double jeopardy protection and its narrower subpart, collateral estoppel." States, 938 A.2d at 1020.

whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." Sealfon v. United States, 332 U.S. 575, 579 [(1948)]. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.[9]

> [9] "If a later court is permitted to state that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest, the possible multiplicity of prosecutions is staggering. [...] In fact, such a restrictive definition of 'determined' amounts simply to a rejection of collateral estoppel, since it is impossible to imagine a statutory offense in which the government has to prove only one element or issue to sustain a conviction." Mayers & Yarbrough, [Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1, 38 (1960)]. ...

Ashe, 397 U.S. at 444 (footnote omitted).

Thus, it is clear from the above passage that a general verdict, i.e., the absence of specific findings of fact, cannot alone defeat a double jeopardy/collateral estoppel claim. Rather, a reviewing court must determine, through a lens of rationality and realism, not hypertechnical logic, "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." Id. Given this standard, we conclude that the trial court erred when it determined that the absence of specific findings of fact by the jury, by itself, conclusively precluded Appellant's argument that double jeopardy and collateral estoppel principles prevented the trial court from reconsidering the issue of Appellant's identity following the jury's verdict.

We next consider several alternative arguments by the Commonwealth in support of affirming the judgment of sentence against Appellant's double jeopardy challenge. First, the Commonwealth argues that the absence of specific stipulations by Appellant forecloses his double jeopardy/collateral estoppel claim. See Commonwealth's Brief at 18 (stating "the lack of stipulation by trial counsel about the other elements of the crime is important … because … the jury was still legally required to consider all the other elements and deliberate upon whether the Commonwealth had proven these elements beyond a reasonable doubt"). The Commonwealth provides no authority for such a rule, and our review of Ashe suggests otherwise.

The Ashe Court applied double jeopardy principles under the following circumstances:

> [S]ix men were engaged in a poker game in the basement of the home of John Gladson at Lee's Summit, Missouri. Suddenly three or four masked men, armed with a shotgun and pistols, broke into the basement and robbed each of the poker players of money and various articles of personal property. The robbers—and it has never been clear whether there were three or four of them—then fled in a car belonging to one of the victims of the robbery. Shortly thereafter[,] the stolen car was discovered in a field, and later that morning three men were arrested by a state trooper while they were walking on a highway not far from where the abandoned car had been found. [Ashe] was arrested by another officer some distance away.

Ashe, 397 U.S. at 437.

The prosecution tried Ashe for the robbery of one of the victims, but the jury found him not guilty. The issue before the United States Supreme Court

was whether the prosecution could then try Ashe for the robbery of the other victims. The High Court concluded that it could not, reasoning:

> Straightforward application of the federal rule to the present case can lead to but one conclusion. For the record is utterly devoid of any indication that the first jury could rationally have found that an armed robbery had not occurred, or that Knight had not been a victim of that robbery. The single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not. The federal rule of law, therefore, would make a second prosecution for the robbery of Roberts wholly impermissible.

Id. at 445 (emphasis added).

Had there been a stipulation that a robbery had occurred, that Knight had been a victim of it, or regarding any other pertinent element of robbery beyond the identity of the perpetrator, it would be quite odd that the Ashe Court failed to mention it. Thus, it is reasonable to assume that no such stipulation existed. Yet, despite the absence of a stipulation to rely upon, it was still clear to the Ashe Court that certain elements of the robbery were not in contention at Ashe's trial. The Ashe Court also rejected the notion that a rational jury disbelieves "substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest[.]" Id. at 444 n.9 (quoting Mayers, supra).

Instantly, the Commonwealth's argument contradicts the Ashe Court's reasoning. Appellant's double jeopardy/collateral estoppel claim is not solely contingent upon his counsel's failure to stipulate to ostensibly uncontested evidence. Instead, we must examine the record to determine if a rational jury

could have acquitted Appellant on any other element besides his identity as the perpetrator.

The Commonwealth also suggests that the jury may have simply exercised lenity. We agree that, in general, lenity is a barrier to drawing specific conclusions from general verdicts. Consequently, we cannot draw a specific conclusion solely from the jury's general verdict. However, our inquiry simply does not end there. Lenity is a theoretical cause of an acquittal in every case, even where there are stipulations and specific findings of fact. The governing standard, however, dictates that we consider all relevant circumstances from Appellant's trial in determining whether any issue other than identity was in dispute. If those circumstances clearly demonstrate that the issue of identity was the sole matter under consideration, invoking lenity to defeat a double jeopardy claim is exactly the sort of "hypertechnical and archaic approach" that was rejected by the Ashe Court.

Appellant contends that a fair reading of the record demonstrates that his identity was the only issue before the jury, and that the remaining elements of Fleeing or Attempting to Elude Police were left uncontested. Based on our independent review of the record, we agree.

During opening arguments, the parties had already framed the case as hinging on Appellant's identity as the perpetrator. Assistant District Attorney ("ADA") Stephen Slinger spoke first. N.T., 4/30/18, at 23-26. After briefly summarizing what he intended to prove at trial, ADA Slinger commented that Appellant "is a distinctive individual. There really isn't a question of mistaken

- 11 -

identity here. It's rather cut and dry." Id. at 26. Appellant was represented at trial by Kayla Schindler, Esq., and her co-counsel, Andrew Capone, Esq. Attorney Schindler opened, and immediately framed the case as one of mistaken identity, stating, "Ladies and gentlemen of the jury[,] [y]ou're going to hear a case of mistaken identity." Id. Attorney Schindler did not present any arguments as to any other element of the crime. Id. at 26-31.

The Commonwealth presented two witnesses, Officer Jeffrey Crum, and his supervisor, Sergeant Tracy Harasyn. Officer Crum provide the only eyewitness testimony of the reckless driving incident, as briefly summarized above by the trial court. Importantly, Officer Crum testified that after observing the vehicle run a red light, the driver turned to look back at the officer and they made eye contact. Id. at 32-33. Additionally, before terminating his pursuit of the fleeing vehicle, he obtained the vehicle's license plate number. From that information, Officer Crum was eventually able to determine that the vehicle was registered to Jeronica Gatewood and Appellant.[4] Id. at 42. Officer Crum, with the help of his supervisor, Sergeant Harasyn, then obtained a photo of Appellant from his driver's license contained in a law enforcement database. Id. Officer Crum identified Appellant from that photo as the driver of the vehicle he had observed. Id. at 43-44. He

_____

[4] The Commonwealth did not present any evidence to substantiate that Appellant's name was on the title or registration of the vehicle.

further testified that Appellant had a distinctive appearance, in that he was a light-skinned black male with dreadlocks and a facial tattoo below his left eye.[5] Id. at 46.

During cross-examination by Attorney Schindler, Officer Crum was questioned about his vantage point at the time he observed the vehicle run the red light, the same vantage point from which he ostensibly was able to identify Appellant's face. Id. at 50-52. Attorney Schindler then attempted to impeach the officer on the basis that, in his initial report, he had described the culprit as a black male, in his 20's, and wearing dreadlocks, but had not mentioned any facial tattoos. Id. at 53-54. Officer Crum had also failed to mention the tattoo at Appellant's preliminary hearing. Id. at 54. Additionally, Officer Crum admitted that he had never described Appellant as a light-skinned black male, rather than as merely a black male, until his trial testimony. Id. at 55. Attorney Schindler did not question Officer Crum regarding any other matters; not one question explicitly or even fairly suggested that Officer Crum's observations regarding the illegal conduct he observed were not credible.

The Commonwealth's only other witness, Sergeant Harasyn, testified solely to matters related to Officer Crum's identification of Appellant. She stated that she assisted Officer Crum in pulling Appellant's photo from the

---

[5] Officer Crum further stated that the facial tattoo "was one of the first things" he "noticed in the picture that was shown to" him from the database. Id. at 46.

database.  Id. at 59.  When she showed Appellant's photo to him, Officer Crum told her that Appellant was the driver of the vehicle that fled from him. Id.  Attorney Schindler's brief cross-examination of Sergeant Harasyn did not broach any other topics.  Id. at 61-62.  Following Sergeant Harasyn's testimony, the Commonwealth rested its case.  Id. at 62.  Appellant then made a motion for judgment of acquittal based upon insufficient evidence of identity.  Id. at 63.  The motion was promptly denied by the trial court.  Id. at 64.

Appellant presented a single witness at trial, his sister, Jeronica Gatewood.  Ms. Gatewood first testified that she owned the vehicle in question. Id. at 65.  She then authenticated Defense Exhibit B, the title to the vehicle. Id. at 65-66.  Only her name was listed on the title.  Id. at 66.  The Commonwealth did not object to the admission of Defense Exhibit B.  Id.

Ms. Gatewood then testified that she was not driving the vehicle on the date of the incident.  Id.  She also stated that at that time, the vehicle was in the possession of her ex-husband.  Id. at 67-68.  She explained that her ex-husband told her that he had lent the vehicle to his friend, a man named Rayquan.[6]  Id. at 68.  She described Rayquan as a dark-skinned black man with dreadlocks.  Id. at 69.  Ms. Gatewood also testified that Appellant never borrowed her car, and that the police had never approached her to question her about the incident.  Id. at 68.  ADA Slinger then briefly cross-examined

_____

[6] Although this testimony was obviously hearsay, the Commonwealth did not object.

Ms. Gatewood. Id. at 69-71. Ms. Gatewood admitted that she was close to her brother, and that her knowledge of who was driving her car at the time of the incident was reliant on her ex-husband's statement. Id. at 70-71.

Appellant declined to testify. Id. at 72. The case then proceeded to closing arguments, where Attorney Schindler addressed the jury first. Her argument was exclusively tailored to the issue of identity. She used Officer Crum's vantage point to cast doubt on his ability to observe the driver's face. Id. at 79-80. She then attacked Officer Crum's identification of Appellant due to his evolving description of the driver from his initial report until trial. Id. at 80-81. Later, Ms. Schindler attempted to buttress these identity arguments by reference to Ms. Gatewood's testimony. Id. at 83. The only statement or argument that Ms. Schindler made to the jury regarding any issue besides identity was a brief comment—indeed, a concession—from which she immediately transitioned into another argument about identity. Id. at 81 ("I don't doubt that Officer Crum probably saw the car go through the intersection. But [Appellant] was not driving it.").

ADA Slinger's closing argument began with an acknowledgement that "this is being put to you as a case of mistaken identity." Id. at 84. The vast majority of his argument concerned identity. Id. ("Now, my assertion to you is it would be hard to mistake [Appellant] sitting in the courtroom here for someone else."); id. ("I will concede that situations of mistaken identity happen, but it didn't happen here."); id. ("Now, [Attorney] Schindler said [Officer Crum] would have gotten a quick glimpse. 20 miles an hour isn't that

fast. It was the middle of the day. Officer Crum made eye contact with [Appellant], got a good look at him and positively identified him."); id. at 86 ("This is not a situation of mistaken identity."). ADA Slinger then attacked Ms. Gatewood's credibility, whose testimony could only be construed as being pertinent to the issue of identity. Id. at 86-87.

> The Commonwealth then briefly discussed other issues:

> Now, [Attorney] Schindler also acknowledged or, excuse me, argued in her closing statement about the description of the area and that this was after graduation, so this doesn't make sense that it was a crowded area; and he couldn't have chased the -- excuse me, that he wouldn't have had to have terminated his pursuit because of the people here. Now, you don't get to have it both ways.

> Her argument to you was that he wasn't driving the car. But now we're arguing about facts regarding the area and the number of people there and things of that nature. You don't get to have it both ways. He was either driving the car or he wasn't driving the car. Or, you know, we could hash out about the pursuit and the facts about the pursuit and the number of people in the area, etcetera, etcetera.

Id. at 88-89. Thus, approximately two paragraphs of his closing argument ostensibly concerned matters other than identity.

However, this statement by ADA Slinger is a clear exaggeration of the following brief statement by Attorney Schindler during her closing argument:

> Now, Officer Crum comes before you today. He starts to describe the scene. All these students out. All these pedestrians. Now, ladies and gentlemen, this was 11:00 a.m. on a Sunday, midsummer. This was June 4th that this incident happened. I asked Officer Crum about that.

> I said, "This was a Sunday; right?" He agreed with me. Like I said, this was mid June, June 4th. This was after Pitt graduation. So does that make sense to each of you?

Id. at 82. This would be the only part of Attorney Schindler's argument that was not clearly directed at the issue of Appellant's identity.

However, at no point did Attorney Schindler state to the jury, or reasonably imply, that Officer Crum "wouldn't have had to have terminated his pursuit because of the people here" as suggested by ADA Slinger. Id. at 88. In any event, whether Officer Crum was justified or not in terminating his pursuit of the fleeing vehicle due to the number of people in the vicinity was not pertinent to the charge before the jury. A misdemeanor violation of 75 Pa.C.S. § 3733 occurs when a "driver of a motor vehicle … willfully fails or refuses to bring his vehicle to a stop, or … otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop…." 75 Pa.C.S. § 3733(a). There is no element related to the officer's reasoning for terminating such a pursuit.

In its brief to this Court, the Commonwealth attempts to reframe this dispute, suggesting that "there is at least one factual scenario supported by the record that would have allowed the jury to conclude that [A]ppellant was the driver of the vehicle and, yet, was not guilty of the fleeing and eluding offense. For instance, the jury might have believed that [A]ppellant never saw the officer's visual or audible signal to bring the vehicle to a stop because of the congestion in the area that the officer described during his testimony." Commonwealth's Brief at 28 (citing N.T, 4/30/18, at 40 ("It's a very, very busy location. If anybody's been through Oakland during lunchtime, getting around that location is a very difficult prospect.")).

This argument is specious at best. First, neither party suggested any such an issue was in contention at trial. It appears for the first time in the Commonwealth's Brief. Moreover, the Commonwealth fails to point to any portion of the record where it was stated or reasonably implied that there was any doubt regarding whether the driver was able to see the police lights or hear the siren.[7]

Second, the theoretical issue the Commonwealth alludes to is contained in Section 3733(c), which sets forth the defenses to the charge of fleeing or attempting to elude a police officer:

(c) Defenses.--

> (1) It is a defense to a prosecution under this section that the pursuing police officer's vehicle was not clearly identifiable by its markings or, if unmarked, was not occupied by a police officer who was in uniform and displaying a badge or other sign of authority.
>
> (2) It is a defense to prosecution under this section if the defendant can show by a preponderance of the evidence that the failure to stop immediately for a police officer's vehicle was based upon a good faith concern for personal safety. In determining whether the defendant has met this burden, the court may consider the following factors:
>
>> (i) The time and location of the event.
>>
>> (ii) The type of police vehicle used by the police officer.

_____

[7] The Commonwealth unconvincingly attempts to suggest that such a fact could have been implied from Officer Crum's testimony that he only got within one or two car lengths of the fleeing vehicle before he ended the pursuit. Commonwealth's Brief at 28. The Commonwealth utterly fails to explain how or why a driver would be unable to detect a police vehicle's lights and siren at such a close distance and, it is facially absurd to suggest that such a distance, by itself, raises such a doubt.

(iii) The defendant's conduct while being followed by the police officer.

(iv) Whether the defendant stopped at the first available reasonably lighted or populated area.

(v) Any other factor considered relevant by the court.

75 Pa.C.S. § 3733(c).

At no point during Appellant's trial were these statutory defenses discussed. Indeed, the trial court never instructed the jury on these defenses. See N.T, 4/30/18, at 102-03. There is a simple and rational reason for this: No evidence suggesting the potential applicability of any of the affirmative statutory defenses to Section 3733 was presented at Appellant's trial. In any event, in acquitting Appellant, the jury could not have relied on a defense of which they were not aware.

Having carefully considered the record before us, we conclude that the only issue upon which the jury could have rationally relied in acquitting Appellant was his identity as the driver. However, the Commonwealth argues that in Yachymiak and Wharton, this Court considered analogous circumstances and came to a contrary conclusion. We disagree, as we find both cases distinguishable.

In Yachymiak,

police officers observed a vehicle being operated erratically, repeatedly crossing the center line of the highway. After signaling the car to pull over, the officers observed the driver squeeze between the bucket seats and move to the rear of the car. When the officers approached the car on foot, appellant's wife was in the driver's seat and appellant was lying on the back seat.

[The a]ppellant was ordered out of the car, and due to the odor of alcohol on his breath was asked to perform field sobriety tests, which he did poorly. He refused to take a breath alcohol test. As a result, he was charged with driving under the influence of alcohol, ... driving under suspension ..., and failure to drive on the right side of the roadway....

* * *

At the conclusion of the trial, the jury returned a verdict of not guilty on the misdemeanor charge. The judge, however, sitting as fact-finder on the summary offenses, found [the] appellant guilty of driving under suspension and failure to drive on the right side of the roadway.

Yachymiak, 505 A.2d at 1025.

On appeal, the appellant in Yachymiak argued that "the jury's acquittal on the charge of driving under the influence necessarily rested upon a specific finding that [the] appellant was not operating the vehicle, due to his admission that he was intoxicated." Id. at 1026. This Court rejected that claim, reasoning:

In the case at bar, for instance, conviction of driving under the influence would have entailed three findings of fact: [the] appellant was operating the vehicle, he was under the influence of alcohol[,] and he was incapable of safe driving. An acquittal entails reasonable doubt of any one of the essential facts. The judge's finding that [the] appellant was operating the vehicle is inconsistent only if the acquittal was based on the jury's doubt that [the] appellant was driving rather than on the absence of either of the other two elements of the offense. Despite [the] appellant's insistence that he did not contest the issue of his intoxication so that his acquittal must be interpreted as a jury finding that he was not the operator of the vehicle, there is at least a reasonable possibility that the verdict was based upon an absence of proof that [he] was intoxicated to a degree which rendered him incapable of safe driving.[1]

> [1] At the conclusion of the Commonwealth's case, [the] appellant's counsel demurred to the charge of driving under the influence because neither prosecuting officer testified to

- 20 -

the opinion that [the] appellant was under the influence. The court denied the demurrer, ruling that the weight of the evidence of the field sobriety tests and the odor of alcohol presented a jury question as to intoxication. Although the evidence that [the] appellant was so intoxicated as to be incapable of safe driving was sufficient to overcome a demurrer, it was not overwhelming.

Id. at 1026–27 (citation to the record omitted, emphasis added).

Based on the above passage, the Commonwealth argues:

Thus, the Yachymiak decision supports the judge's verdict in this case because this Court recognized in Yachymiak that one cannot speculate as to the basis for the jury's verdict and that, moreover, it is always possible that the jury's verdict was an exercise of the jury's lenity as opposed to a jury's finding on any specific element.

Commonwealth's Brief at 25.

In its analysis of Yachymiak, the Commonwealth omits the Court's footnote. See id. In so doing, the Commonwealth overlooks a critical portion of the Yachymiak Court's analysis. In that footnote's absence, it may appear that the Court premised its conclusion that "a reasonable possibility [existed] that the verdict was based upon an absence of proof that [the] appellant was intoxicated" on the mere theoretical chance that the acquittal was premised on proof of intoxication rather than identity, despite Yachymiak's admission. Yachymiak, 505 A.2d at 1027. However, the footnote makes it clear that the Court's decision was instead more nuanced and based on the specific circumstances of that case. Despite Yachymiak's not challenging his intoxication at trial, the Court determined that the record showed that the Commonwealth's intoxication evidence was still "not overwhelming." Id.

- 21 -

We ascertain no equivalent circumstances in this case regarding the non-identity elements of Section 3733(a). Officer Crum's testimony clearly established a violation of the statute, the only question that remained was whether Appellant was the driver. As noted above, in Ashe, the United States Supreme Court clearly disproved of assuming a jury "disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest...." Ashe, 397 U.S. at 444 n.9 (quoting Mayers, supra). Here, the record is void of any reason to disbelieve Officer Crum's observation that the vehicle in question failed to stop despite obvious and close police pursuit. The Yachymiak Court determined, by contrast, that while there was evidence of the defendant's intoxication, it was not overwhelming. Thus, that case is distinguishable on the facts.

Wharton, which relied in substantial part on Yachymiak, is also distinguishable from the instant matter. In that case, the defendant was charged with numerous offenses after the vehicle he was allegedly driving crashed, killing his girlfriend. Wharton, 594 A.2d at 696. The Wharton Court indicated that Wharton "defended on grounds that his deceased girlfriend had been the driver of the vehicle." Id. A jury acquitted him on all homicide offenses, but the trial court subsequently found him guilty of several summary offenses after hearing additional evidence. Id. at 697.

The specific question before the Wharton Court was whether the defendant was literally tried twice for the same incident. Unlike in the instant case, the trial court in Wharton heard additional evidence ten days after the

jury had rendered its verdict. Id. This Court nevertheless reasoned that the "charges against [Wharton] were, in fact, consolidated in a single trial in which the jury was the fact finder in the felony and misdemeanor charges and the trial court was fact finder in the summary charges." Id. The Court ultimately concluded that "[p]rinciples of double jeopardy have not been violated merely because the receipt of additional evidence was delayed until after the verdict of the jury had been returned." Id. at 699 (emphasis added).

Our decision today does not conflict with the specific holding at issue in Wharton. There was no additional evidence presented at a later date that preceded the trial court's verdict. Moreover, we decline to read Wharton as standing in conflict with the constitutional standard set forth in Ashe.[8] There was no discussion in Wharton about the specific nature of the non-identity evidence presented before the jury, and/or whether such evidence (or the lack thereof) could have formed the basis for acquittal on non-identity grounds.[9] Accordingly, Wharton is distinguishable and, therefore, not controlling here.

In sum, we conclude that the trial court erred in determining that the absence of specific findings of facts by the jury, alone, precluded Appellant's double jeopardy/collateral estoppel argument. We reject the Commonwealth's related argument that Appellant's double jeopardy/collateral estoppel claims are precluded solely because he failed to stipulate to issues

_____

[8] See note 3, supra.

[9] Nor is there any indication that Wharton had made such specific claims in his appeal.

- 23 -

that were, nonetheless, not in dispute at trial. We also reject the Commonwealth's argument that the principle of lenity is a catch-all that would swallow the rule in Ashe. After reviewing all the circumstances of Appellant's consolidated trial, it is plain from the record that a rational jury did not acquit Appellant on any ground aside from identity. Accordingly, we hold that double jeopardy principles barred Appellant's conviction for the three summary MVC offenses at issue in this appeal, as that conviction followed the jury's verdict from the same trial, and was necessarily premised on the trial court's simply disagreeing with the jury's conclusion that Appellant was not the driver in question. Finally, we discern no conflict in our decision with this Court's prior holdings in Yachymiak and Wharton.

Judgment of sentence reversed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/2020